Filed 11/13/20  P. v. Gonzalez CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>RONOBER GONZALEZ,<br><br>　　Defendant and Appellant. | B301832<br><br>(Los Angeles County Super. Ct. No. LA088710) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Martin Larry Herscovitz, Judge.  Affirmed, with instructions.

John F. Schuck, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey,

Senior Assistant Attorney General, Noah P. Hill, Supervising Deputy Attorney General, Nima Razfar, Deputy Attorney General, for Plaintiff and Respondent.

_____

The jury found defendant and appellant Ronober Gonzalez guilty of two counts of misdemeanor disobeying a domestic relations court order (Pen. Code, § 273.6, subd. (a)[1] [counts 5 & 8]), one count of injuring a spouse (§ 273.5, subd. (a) [count 7]), and one count of stalking (§ 646.9, subd. (b) [count 9]).  The jury found Gonzalez not guilty of first degree burglary with person present (§ 459 [count 1]), assault with a deadly weapon, a knife (§ 245, subd. (a)(1) [count 2]), criminal threats (§ 422, subd. (a) [count 3]), vandalism over $900 (§ 594, subd. (a) [count 4]), and attempted premeditated murder (§§ 187, 664 [count 6]).

Gonzalez was sentenced to three years in count 9, and one year in count 7, for a total of four years in state prison.  The court imposed concurrent sentences of 364 days each in counts 5 and 8.

On appeal, Gonzalez contends that the trial court abused its discretion by admitting evidence of a prior incident of domestic violence and expert testimony regarding domestic violence.  He further contends, and the People concede, that the sentences in counts 5 and 8 must be stayed pursuant to section 654.

_____

[1] All further statutory references are to the Penal Code unless otherwise indicated.

We order that the abstract of judgment be corrected to properly reflect that Gonzalez's sentences for disobeying a domestic relations court order (§ 273.6, subd. (a)) in counts 5 and 8 are stayed pursuant to section 654. In all other respects, we affirm the judgment.

## FACTS

The victim and Gonzalez dated for six years, and married on October 8, 2016. Soon after they married, Gonzalez began acting aggressively toward the victim. He physically abused her after drinking too much on several occasions.

A few weeks into their marriage, Gonzalez came home drunk and hit the victim on the head. A week later, he hit her again while he was drunk, stating that he hated her and calling her a "fucken bitch." The victim left and lived with her son for the next seven or eight months. During that period, Gonzalez texted her every day and asked her to forgive him. They ultimately reunited and began living together again in July 2017.

On Thanksgiving in 2017, the victim had lunch with her children without Gonzalez, and planned to have Thanksgiving dinner with Gonzalez at his uncle's house later. When she arrived home, she did not see Gonzalez. She decided to go to his uncle's house by herself in hopes that Gonzalez would meet her there. Gonzalez never came to the dinner. When the victim went home later that night,

Gonzalez was drunk.  He argued with her about why she had not stayed with him.  The victim was lying in bed.  Gonzalez struck the side of her head and put his hands around her neck, but she was able to pull free.  Gonzalez then threatened to cut her and her children into little pieces.  He continued drinking, and he walked in and out of the room during the night.  The victim fell asleep.  When she awoke the next morning, she found a knife under Gonzalez's pillow.  She confronted Gonzalez, and he apologized.  He said that he was so drunk he did not know what he was doing.

The victim filed for divorce on March 18, 2018.  When Gonzalez was served with the divorce papers, he promised her he would change and be a better person.  The couple continued living together, but slept separately most of the time.

On March 31, 2018, the victim, her children, and ex-husband celebrated her daughter's 18th birthday at Universal Studios (count 7).  Gonzalez was not invited because he did not like the victim's children.  He texted the victim numerous times throughout the day but she did not respond because her phone was out of battery, so she did not see the messages. When she explained this to Gonzalez he cursed at her.  When the victim got home Gonzalez was not there.  At around 10:30 p.m., he arrived home intoxicated and started arguing with her about spending the day with her children and not returning his text messages.  Gonzalez called her "nasty names" such as "fucken bitch" and "cocksucker."  Gonzalez had been sitting at the dining table

drinking, but suddenly stood, walked towards the victim, and spat in her face. He wrapped a blanket that the victim had around herself around his fist and he hit her on the side of the head, causing bruising and swelling. She ran out of the apartment and called 911. The police arrived and arrested Gonzalez. One of the responding officers observed "a swelling contusion" around the left side of the victim's face. After the incident, Gonzalez moved out of the couple's apartment.

The victim obtained a restraining order against Gonzalez on April 26, 2018 (count 9). Sometime around the middle of the following month, she came home to her apartment and saw Gonzalez inside. He asked her to work things out with him and remove the restraining order. She allowed him stay in the apartment that night, but told him that they could not be together the next morning. Gonzalez left, but continued to text her. The victim asked Gonzalez to leave her alone.

On May 29, 2018, the victim went to the courthouse for a misdemeanor matter against Gonzalez. Gonzalez approached her in the hallway, touched her face, and laughed as he walked away. The victim did not want Gonzalez to go to jail; she just wanted him to leave her alone. At the hearing, she told the judge what Gonzalez had done.

Gonzalez entered the victim's apartment on several occasions after being served with the restraining order. On one occasion, the victim discovered an envelope on her

5

dining table with a handwritten note from Gonzalez inside. On the front he wrote, "Why are you mad with me? I don't get it. One day you're going to miss me." On the back he wrote, "Bad prostitute."

Around June 3, 2018, the victim returned home after visiting her daughter in Texas and noticed there was salt strewn all over her apartment. Two wine bottles had been emptied, and the apartment smelled like cigarette smoke. Gonzalez is a smoker.

On June 10, 2018, the victim came home to find Gonzalez sleeping in her apartment (count 8). She went outside and called 911. Gonzalez left before the police officers arrived. The officers helped the victim change the locks to her door.

Gonzalez continued sending the victim text messages. On June 27, after driving through the gate of her apartment complex, the victim saw Gonzalez in her rearview window. Gonzalez followed her and approached the driver's side window. He touched the car and laughed at the victim. She took a picture of him before he walked away.

On July 4, 2018, the victim's divorce became final. She spent the day at a Dodger's game and then went to a barbecue at her son's house. When she arrived home shortly after midnight on July 5, Gonzalez grabbed her neck from behind as she opened the apartment door (count 5). He had a knife in his hand and smelled of alcohol. Gonzalez asked the victim where she had been, and then threatened to kill her. The victim begged for her life. Gonzalez dragged her

inside the apartment and attempted to stab her; the knife got close to her neck. They struggled, and the victim was able to force the knife out of Gonzalez's hand. He fell, and the victim fled. Gonzalez grabbed the knife and chased her until she got into her car, locked the doors, and called 911. Gonzalez left before the police arrived. The victim later noticed damage in her apartment, including slashed furniture and spilled wine on a rug. The police arrested Gonzalez later that day.

## DISCUSSION

### *Evidence of Prior Acts of Domestic Violence*

In the People's trial brief, the prosecution sought to admit at trial evidence of Gonzalez's prior acts of domestic violence against his former girlfriend, Norma C., which occurred in 2004 and 2008, pursuant to Evidence Code section 1109.

The trial brief described the two incidents as follows:

On July 25, 2004, Norma C. called 911 and reported that Gonzalez had grabbed her during an argument, pushed her into a chair, attempted to punch her, and grabbed her arms to prevent her from using the phone to report the incident. The city attorney declined to file charges.

On April 11, 2008, Norma C. called 911 again. When she arrived home that day, Gonzalez was intoxicated and they argued about his drinking. Gonzalez kicked a door off

of its hinges and pushed Norma C. onto the bed during the argument. Norma C.'s son witnessed the incident and corroborated her version of events. On April 14, 2008, Gonzalez was convicted of violating Penal Code section 243, subdivision (e)(1) with respect to this incident.

The People argued that Gonzalez's acts of alcohol-related violence against his prior partner were extremely probative of his history of recidivist conduct, and not unduly prejudicial because the incidents were less egregious than the charged crimes. The 2008 incident occurred within 10 years of the first charged incident, in conformance with Evidence Code section 1109, subdivision (e).[2] Although it was outside of the 10-year statutory window, the prosecution argued that the 2004 incident should be admitted in the interests of justice because the relationship between Norma C. and Gonzalez directly preceded that of Gonzalez and the victim. The evidence would be presented briefly, through Norma C.'s testimony and her son's testimony or the recording of her 911 call, and would therefore not involve an undue consumption of time.

The parties argued the matter in a hearing prior to trial. The prosecutor argued that although the 2004 incident occurred more than 10 years prior to the charged crimes, the

---

[2] Evidence Code section 1109, subdivision (e) provides "Evidence of acts occurring more than 10 years before the charged offense is inadmissible under this section, unless the court determines that the admission of this evidence is in the interest of justice."

incident demonstrated that Gonzalez had a pattern of becoming intoxicated and then becoming violent with his significant other. The 2008 incident occurred within 10 years of the March 31, 2018 incident (count 7), but was outside of the statutory timeframe with respect to the other counts. Regardless, all of the incidents were part of a course of conduct, which made the evidence of the 2008 incident admissible with respect to all counts.

The trial court verified that defense counsel agreed that the 2004 and 2008 incidents were acts of domestic violence, and that the defense only contested timing and considerations pursuant to Evidence Code section 352. Defense counsel agreed, arguing: "I think that [the 2008 incident] is only relevant as to -- or -- and also within the time period for [counts] seven and nine, but not for the remaining seven counts. And seeing as how the remaining seven counts include an attempt murder and assault with a deadly weapon and criminal threats, residential burglary, and we can't really separate those two less severe counts from the rest of the case, I think this is definitely more prejudicial than it is probative."[3]

The trial court ruled that the incidents were part of a continuous course of conduct, and that, because at least two events took place within 10 years of the 2008 incident, it would admit the 2008 incident as to the other incidents,

---

[3] The record indicates that there was some confusion regarding whether the 2008 incident occurred within 10 years of the incident charged in count 9. It did not.

9

which were only a few months outside of the statutory timeframe, in the interests of justice.  (Evid. Code, § 1109, subd. (e)).  The court stated that the evidence was particularly relevant to the stalking charge in count 9.  It found that the 2008 incident involved "much less" violence than the charged offenses.  The court denied the motion to admit the 2004 incident as too remote in time.

At trial, Norma C. testified that she and Gonzalez had a child and were living together on April 11, 2008.  They had been in a relationship for approximately four years at that time.  Gonzalez came home intoxicated.  Norma C. did not want to open the door for him, but he forced his way inside.  Norma C. grabbed the children and went into the bedroom to hide from Gonzalez, "[b]ecause when he drinks, he becomes violent.  He goes crazy."  Gonzalez kicked the bedroom door.  Norma C. came out of the bedroom to confront him, and Gonzalez pushed her chest, causing her to fall onto the bed.  Norma C.'s oldest son told her to call the police, so she did.

A recording of the 911 call was played for the jury.[4]  Norma C. testified that she remembered telling the police that Gonzalez kicked a door off of its hinges, but she could not recall which door it was.  She opened the bedroom door voluntarily.  Gonzalez told her that he was not afraid of the police if she wanted to call them.  He walked away when she

---

[4] The 911 call was made in Spanish.  The translation of the 911 call that was provided to the jury was consistent with Norma C.'s testimony.

10

called 911.  Gonzalez was still present when the police arrived.

### **Legal Principles**

Evidence Code section 1109, subdivision (a)(1), permits admission "in a criminal action in which the defendant is accused of an offense involving domestic violence, [of] evidence of the defendant's commission of other domestic violence . . . ."  "[E]ven if evidence of uncharged crimes is relevant for a purpose other than the defendant's character or disposition, before admitting the evidence a trial court must also find it has probative value that is not substantially outweighed by its potential for undue prejudice under Evidence Code section 352." (*People v. Gutierrez* (2018) 20 Cal.App.5th 847, 859–860; Evid. Code, § 1109, subd. (a).)  "Relevant factors in determining prejudice include whether the prior acts of domestic violence were more inflammatory than the charged conduct, the possibility the jury might confuse the prior acts with the charged acts, how recent were the prior acts, and whether the defendant had already been convicted and punished for the prior offense(s)." (*People v. Rucker* (2005) 126 Cal.App.4th 1107, 1119.)  We review the trial court's decision whether to admit evidence, including evidence of other crimes, for abuse of discretion.  (*People v. Leon* (2015) 61 Cal.4th 569, 597.)

11

### Analysis

On appeal, Gonzalez argues that the 2008 incident was not sufficiently similar to the charged events and too remote in time to be admitted under section 1109. He further contends that the evidence was unduly prejudicial under Evidence Code section 352, because (1) the evidence portrayed him as the kind of person who willingly engages in assaultive conduct in front of small children, (2) the jury might be inclined to punish him for the 2008 incident because he had not been convicted, and (3) the evidence offered in support of the charged offenses was weak. Gonzalez contends that the trial court's admission of the evidence was an error of constitutional proportions.

The People argue that Gonzalez's arguments with respect to Evidence Code section 1109 were forfeited because he failed to raise them in the trial court. We agree. Defense counsel conceded that the 2008 incident was admissible under Evidence Code section 1109, arguing only that it was outside of the statutory timeframe with respect to all counts other than counts 7 and 9.[5] On appeal, Gonzalez argues that the incidents were not sufficiently similar and that the evidence is too remote to be relevant under Evidence Code section 1109, although he concedes the 2008 incident falls within the 10-year timeframe. We will not entertain these

---

[5] Gonzalez does not argue that the 2008 incident was outside of the 10-year statutory timeframe with respect to count 9 on appeal.

arguments made for the first time on appeal. (*People v. Fuiava* (2012) 53 Cal.4th 622, 670, quoting *People v. Clark* (1992) 3 Cal.4th 41, 125–126 ["'[i]n the absence of a timely and specific objection on the ground sought to be urged on appeal, the trial court's rulings on admissibility of evidence will not be reviewed'"].)

We reject Gonzalez's arguments relating to Evidence Code section 352. First, the 2008 incident was not overly inflammatory. As the trial court noted, the incident did not involve the same level of violence as the charged incidents. In 2008, Gonzalez kicked down a door and pushed Norma C. onto a bed. There was no evidence presented that Norma C. suffered injuries as a result. Here, Gonzalez spat in the victim's face and hit her in the head causing visible bruising and swelling.

Although the 2008 incident took place almost 10 years prior to the time when the charged incidents began, the incident was relevant and probative because Gonzalez's long-term relationship with Norma C. preceded his long-term relationship with the victim. In both cases, Gonzalez exhibited violent tendencies against women with whom he had a long-term relationship. Gonzalez's violence occurred after drinking to the point of intoxication, and the violence was similar in nature—a physical push with Norma C. and a hit to the victim's head.

With respect to Gonzalez's argument that the jury would be inclined to punish him because he was not punished for the 2008 incident, it was represented at the

hearing outside of the presence of the jury that Gonzalez was, in fact, convicted of a violation of section 243, subdivision (e)(1) in connection with that incident, a fact which defense counsel did not refute. Defense counsel never sought to elicit this information at trial, and, absent a claim of ineffective assistance of counsel, Gonzalez cannot now complain on appeal that he was prejudiced at trial. Regardless, the possibility that the jury would assure Gonzalez's punishment for the prior acts by convicting him in the present case was not significant enough to outweigh the strong probative value of the evidence. In fact, the jury found Gonzalez not guilty in counts 1, 2, 3, 4, and 6.

Gonzalez argues that the People's evidence in support of count 7 was weak. He asserts that the bruising on the victim's face was difficult to see in photographs and did not leave "any deep mark." He also notes that the victim refused medical attention, and he contends the victim was not a credible witness. He argues the 2008 incident biased the jury against him, causing it to "naturally think, 'here he goes again,' and give short shrift to whatever discrepancies and inconsistencies in the evidence it found."

Substantial evidence supported Gonzalez's conviction under section 273.5, subdivision (a). The victim testified that Gonzalez struck her in the head, causing her to suffer bruising and swelling, and a responding officer testified that he observed redness and swelling on her face when he encountered her at the scene. There is no legal requirement that a victim suffer "deep marks" for the prosecution to

14

prove that she experienced domestic violence. (*Conservatorship of Lee C.* (2017) 18 Cal.App.5th 1072, 1095 ["[a] traumatic condition can be a minor injury, such as a bruise"]; accord, *People v. Beasley* (2003) 105 Cal.App.4th 1078, 1085–1086.)

To the extent that Norma C.'s testimony supported this evidence, it did so in a permissible manner. Gonzalez confuses the prejudice that flows from strong probative evidence, and that which flows from purely emotional bias unrelated to the issues. (See *People v. Doolin* (2009) 45 Cal.4th 390, 439 (*Doolin*), quoting *People v. Zapien* (1993) 4 Cal.4th 929, 958 ["'[t]he prejudice that section 352 "'is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence'"'"].) As the Legislature commented when enacting Evidence Code section 1109, "'The propensity inference is particularly appropriate in the area of domestic violence because on-going violence and abuse is the norm in domestic violence cases. Not only is there a great likelihood that any one battering episode is part of a larger scheme of dominance and control, that scheme usually escalates in frequency and severity. Without the propensity inference, the escalating nature of domestic violence is likewise masked. If we fail to address the very essence of domestic violence, we will continue to see cases where perpetrators of this violence will beat their intimate partners, even kill them, and go on to beat or kill the next intimate partner. Since criminal prosecution is one of the few factors which may interrupt the

15

escalating pattern of domestic violence, we must be willing to look at that pattern during the criminal prosecution, or we will miss the opportunity to address this problem at all.' (Assem. Com. Rep. on Public Safety (June 25, 1996) pp. 3–4.)" (*People v. Johnson* (2000) 77 Cal.App.4th 410, 419.)

We cannot conclude that the trial court abused its discretion in admitting the evidence of the 2008 incident involving Norma C. With respect to Gonzalez's constitutional argument, "'[a]pplication of the ordinary rules of evidence generally does not impermissibly infringe on a . . . defendant's constitutional rights.' [Citation.]" (*People v. Prince* (2007) 40 Cal.4th 1179, 1229 (*Prince*).) Gonzalez has not persuaded us that his case presents an exception to this rule.

### Expert Testimony Regarding Domestic Violence

The prosecution also sought to admit the testimony of expert witness Gail Pincus regarding domestic violence under Evidence Code section 1107, to demonstrate the effects of intimate partner battering on the victim, and specifically to explain the victim's behavior in response to the domestic violence.

At a pre-trial hearing on the matter, defense counsel argued that Ms. Pincus's testimony was unnecessary because she would not be "providing any information that people don't already know about domestic violence." Defense counsel asserted, "it's general knowledge that domestic

16

violence causes mental abuse and suffering, phys -- both physical and emotional suffering."

The prosecution explained that it was offering the evidence to "explain the ambivalence that [the victim] felt that's clearly . . . so prevalent that they made an Evidence Code section for it.  So, pursuant to [Evidence Code] section 1107, I would just have Ms. Pincus testify about the general phenomenon of the cycle of violence and the effects of intimate partner violence on the victim."

The court responded that the evidence was only relevant "to explain [the victim's] behavior in reporting and allow[ing] him back in the household despite domestic violence, which may be counterintuitive in the minds of many jurors.  But it's going to have to be fairly brief."  The court ruled that it would admit the evidence in this limited fashion, and defense counsel declined to argue further.

During voir dire, the prosecutor questioned several potential jurors regarding whether they would have trouble believing a witness if she had not reported an abusive partner to the police until he had abused her multiple times. Two jurors said they would not have trouble believing the witness.  One potential juror explained his or her view that abuse creates a "loop" or cycle of violence wherein the abuser "de-escalate[s]" after the abuse, but then later becomes violent again.  Another potential juror remarked that "fear, denial, shame, and a whole bunch of things going on that we still probably don't understand, protection of children, and all kinds of things would be a natural reason why things

wouldn't get reported"; three other potential jurors, when directly asked, indicated they agreed with these comments. In contrast, another prospective juror stated that he or she would "automatically disbelieve" someone who did not report violence the first time it occurred and would think that maybe the victim was making it up.

During a recess from voir dire and outside of the presence of the jury, the trial court discussed the issues further with the parties:

"The Court: . . . I will tell you in light of these 2 jurors unsolicited have shown much of the testimony -- proposed testimony by Miss Pincus, I may consider whether that testimony [*sic*] that's past [*sic*] in -- was past [*sic*] in 1991, that I think we come [*sic*] a long way, and that although the concept that she would testify is more new and not part of the general knowledge of the community in 1991, as you saw from the answers of the jurors, it is now.

"So let's leave Miss Pincus out of the opening statement until we come to a decision on that.

"[Prosecutor]: I don't have a problem keeping it out of my opening. I would like to know that the legislation has not been rescinded.

"I understand we have come a long way, but it doesn't mean it's unnecessary because I'm not sure that [one of the jurors who described the effects of intimate partner battery] will be back in the room to testify about it.

"The Court: I'm not sure that they all agreed with [the jurors who described the effects of intimate partner battery]."

Later, also outside of the presence of the jury, the court revisited the issue, and allowed defense counsel to make further arguments. Defense counsel stated that Ms. Pincus would not be testifying to anything that a layperson would not already know, as evidenced by the jurors' comments in voir dire.

The trial court responded that it believed the expert could provide insight regarding why the relationship would continue after Gonzalez harmed the victim. The trial court ruled that the expert would be allowed to give limited testimony on that specific issue.

At trial, Ms. Pincus, a licensed social worker, testified regarding "the cycle of violence" in an abusive relationship, in which the abuser is "charming and romantic and then violent behind closed doors." There are often three stages in the cycle: "tension rising period in the relationship," "the actual physical violence or explosion," and then "the honeymoon." Women stay through the "tension" phase to get to the "honeymoon," when they will be "back to that charming romantic part of the relationship."

Ms. Pincus explained: "The victim does a dance of accommodation." She enters the relationship loving the abuser. When he begins to criticize her, the victim examines her own actions and tries to show the abuser that she is worthy of affection. The victim excuses isolation imposed by

19

the abuser and control exercised by the abuser, justifying her loss of independence as one less thing to worry about. When the abuser is violent, she minimizes it and blames herself. The victim does not trust her own memories and looks to the abuser for the truth.

When the abuser is physically violent, the victim leaves. The abuser, who is desperate to regain control, finds her, and begs and pleads for forgiveness. The victim clings to the hope that the abuser will keep his promises and not harm her, so she returns to the relationship. The abuser loses respect for the victim when she returns, and tightens his control over her. This pattern of violence continues to the point where the victim develops post-traumatic stress disorder, and becomes emotionally numb and depressed. She becomes hyper-vigilant, walking on eggshells around the abuser. She remains this way until the abuser does something that she believes will be harmful or life-threatening to herself or someone she loves. She does not have concern for herself, but she believes that if something happens, it will be her fault, and someone she loves will be harmed. When this "trauma window" opens, she is able to report the abuse and feel safe for a short period. This stage is fragile, and is easily broken when anything reminds the victim that she is unsafe. The abuser may close the trauma window by asking for forgiveness and engaging in "honeymoon" behavior, causing the victim to return to him.

Battered women underreport incidents of violence. Years of violence may occur before they seek help.

## Analysis

Evidence Code section 1107, subdivision (a), provides: "In a criminal action, expert testimony is admissible by either the prosecution or the defense regarding intimate partner battering and its effects, including the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of victims of domestic violence, except when offered against a criminal defendant to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge."

In his opening brief, Gonzalez argues that: "Expert testimony regarding domestic violence is supposedly relevant under Evidence Code section 1107 only where the jury may have common misconceptions regarding such conduct. Assuming such relevancy, the idea is that expert evidence is needed to disabuse the jurors of those misconceptions. However, where, as here, there are no misconceptions, the expert evidence is not relevant; thus, it is not admissible." Gonzalez further contends that the error violated his constitutional rights.

Gonzalez's contention misconstrues the law. The statute contains no such limitation. "[F]or an expert's opinion to be admissible, the subject matter need not be completely unfamiliar to the jury. Rather, expert testimony has been held admissible in a range of cases where the general subject matter of the expert's testimony may be familiar to the average juror, yet critical aspects of that

21

subject 'are not likely to be fully known to or understood by the jury.' (*People v. McDonald* (1984) 37 Cal.3d 351, 377.) One such subject matter . . . is the behavior of victims of domestic violence. In such cases, courts have recognized that leaving jurors to rely solely on their personal experiences and common sense about domestic relationships—and how the average person evaluates and reacts to a threat of imminent danger—will tend not to result in reliable factfinding by the jury." (*People v. Sotelo-Urena* (2016) 4 Cal.App.5th 732, 753–754.) In this case, the fact that there may be a misunderstanding of the subject was evidenced by one prospective juror, who indicated that he or she would find a victim's testimony that Gonzalez had been physically violent with her several times before the victim reported an incident to authorities not credible.

"[E]xpert . . . testimony [regarding intimate partner abuse] is relevant to explain that it is common for people who have been physically and mentally abused to act in ways that *may* be difficult for a layperson to understand." (*People v. Riggs* (2008) 44 Cal.4th 248, 293 (*Riggs*), italics added.) There are "two major components to a relevance analysis in this context. First, there must be sufficient evidence in the particular case to support a contention that [intimate partner battery] applies to the woman involved. (*People v. Gomez*[ (1999)] 72 Cal.App.4th[405,] 415.) Second, there must be a contested issue as to which the [intimate partner battery] testimony is probative. (Evid. Code, § 801.)" (*People v. Gadlin* (2000) 78 Cal.App.4th 587, 592.)

Here, there was substantial evidence that the victim suffered the effects of intimate partner battery—she testified that Gonzalez had been violent with her on several occasions, but that she continued the relationship despite the violence and did not report the incidents to authorities until the charged incidents took place. The main issue in contention in this case was the victim's credibility. As defense counsel commented in closing argument, "a lot of this case, I would say probably 99 percent, rests on credibility. How much do we believe [the victim]?" Further, on cross-examination of the victim, defense counsel elicited that after Gonzalez "supposedly abused" the victim causing her to move out, the victim did not seek a restraining order during the subsequent seven or eight months, despite Gonzalez nonstop calling and texting her, and she then resumed their relationship and moved in with him. Intimate partner battery testimony was highly relevant to the victim's credibility—without it, jurors may have found her testimony that she stayed with Gonzalez to be inconsistent with her testimony that he had become violent with her before the first reported incident. (See *Riggs*, *supra*, 44 Cal.4th at p. 293 [expert testimony on intimate partner battery is relevant to the victim's credibility and may be presented even if defendant never expressly contests her credibility].)

The trial court did not abuse its discretion by admitting the expert's testimony. Any prejudice that Gonzalez suffered was the permissible prejudice that flows from relevant evidence. (See *Doolin*, *supra*, 45 Cal.4th at

23

p. 439 [Evidence Code section 352 is not designed to prevent prejudice from admission of highly probative evidence].) Gonzalez's constitutional argument fails for the same reason as his argument that the evidence of the 2008 incident with Norma C. was an error of constitutional proportions did—the trial court applied the ordinary rules of evidence in admitting the expert testimony, and Gonzalez has not convinced us that his case is worthy of an exception to the general rule that application of the rules of evidence does not violate the defendant's constitutional rights. (*Prince, supra,* 40 Cal.4th at p. 1229.)

### *Imposition of Separate Sentences in Counts 5 and 8*

Gonzalez contends, and the People concede, that the sentences imposed concurrently in counts 5 and 8 must be stayed pursuant to section 654. We agree.

Under section 654, subdivision (a), "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." The question whether section 654 applies is one of fact for the trial court, which is "vested with broad latitude in making its determination." (*People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1378 (*Ortiz*).) We review the trial court's factual determinations for substantial evidence (*People v. McCoy* (2012) 208 Cal.App.4th 1333, 1338),

24

viewing the evidence in the light most favorable to those determinations (*Ortiz*, *supra*, at p. 1378; *People v. Jones* (2002) 103 Cal.App.4th 1139, 1143).

"The test for determining whether section 654 prohibits multiple punishment has long been established: 'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' [Citation.]" (*People v. Britt* (2004) 32 Cal.4th 944, 951–952 (*Britt*), disapproved on another ground in *People v. Correa* (2012) 54 Cal.4th 331.) "If, on the other hand, defendant harbored 'multiple criminal objectives,' which were independent of and not merely incidental to each other, he may be punished for each statutory violation committed in pursuit of each objective, 'even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.' [Citation.]" (*People v. Harrison* (1989) 48 Cal.3d 321, 335; accord, *People v. Vu* (2006) 143 Cal.App.4th 1009, 1033.) "'"The principal inquiry in each case is whether the defendant's criminal intent and objective were single or multiple." [Citation.] "A defendant's criminal objective is 'determined from all the circumstances . . . .'"' [Citation.]" (*People v. Sok* (2010) 181 Cal.App.4th 88, 99; see *Britt, supra*, at p. 954.)

Gozalez's conviction for stalking was based on his violations of a court's protective order. He was convicted and

25

punished for stalking under section 646.9, subdivision (b). Section 646.9 provides, "(a) Any person who willfully, maliciously, and repeatedly follows or willfully and maliciously harasses another person and who makes a credible threat with the intent to place that person in reasonable fear for his or her safety, or the safety of his or her immediate family is guilty of the crime of stalking . . . . [¶] (b) Any person who violates subdivision (a) *when there is a temporary restraining order, injunction, or any other court order in effect prohibiting the behavior described in subdivision (a) against the same party*, shall be punished by imprisonment in the state prison for two, three, or four years." (Italics added.) The information alleged that the crimes of disobeying a court order occurred on July 5, 2018 (count 5), and June 10, 2018 (count 8). The stalking charge in count 9 was alleged to have occurred between April 26, 2018, and July 5, 2018. In closing argument, the prosecutor told the jury: "So the next in time is this span from April 26th. And that date is significant because that protective order was issued on that date and this stalking [charge] specifies during the time that the defendant was subject to that protective order. So it begins, the conduct, on April 26th, and then it continues until he's arrested on July 5th." There is no question that the jury found the particular incidents of violating a protective order to be part of the stalking behavior that occurred at the same time. Because there is no way of separating these violations from behavior constituting the stalking offense, the sentences in counts 5

26

and 8 must be stayed.  (§ 654 ["[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment"].)

## DISPOSITION

The trial court is directed to prepare a corrected abstract of judgment to properly reflect that Gonzalez's sentences for disobeying a domestic relations court order (§ 273.6, subd. (a)) in counts 5 and 8 are stayed pursuant to section 654.  The trial court shall forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

MOOR, J.

We concur:

RUBIN, P. J.

KIM, J.

27